this place records may I proceed Thomas on behalf of petitioner Shin Dee Kwan you're not got this case from the mr. William Chiang and basically I have a couple observations I'd like to point out that I noticed the government's brief request that the court look at both the BIA and the immigration judges decision I have no problem with that I know we didn't follow optional reply brief so I'm taking this opportunity to say that and I think if we do look at both the immigration judges and the BIA's decision what we notice is that the Board of Immigration Appeals in their decision they supported the decision of Mr. Shin for what I count five reasons and I note that the immigration judge has six reasons and why I think this is important is because it's that six reason at page 20 or excuse me on the immigration judges decision at page 62 that really highlights what we believe is mr. Shan may have been had a little bit of bias in his proceedings in particular I can't in the immigration I J's decision you're talking about the oral decision in orders of the immigration judge yes I have it at page 62 in the administrative record okay I have the page numbers from the opinion like what page would that be in the opinion I have page 8 yes one of the items the immigration judge was harping on was that mr. Shan this is a worker's right type that was the basis of the claim in his statement said he was arguing with public security officials which ultimately led to his arrest but during testimony he didn't say was arguing he said it was reasoning but towards the middle of the page the IJ found that well that's inconsistent and I believe that shows you lack of credibility but the statement following that in the page and I quote the IJ the significance of this inconsistency about whether the respondent argued with the authorities is that in my experience with the court in Los Angeles an assertion of an argument with the authorities is often used as a pretext for subsequent beatings or other mistreatment when the underlining claim is not made in good faith now to me I read that and I think that this immigration judge come out because he read the statement before going into the pre-judging the case as one of these based on my experience one of these cases where they argue and that's the pretext and these are bad faith claims now I note that the BIA didn't address that they said well the adverse credibility determination stands based on reasons 1 through 5 in the immigration judge's decision and we don't want to look at the reason I just pointed out in the IJ's BIA has advanced well yes and no your honor because I point out on page in the DOJ's brief at page 14 so we'll check that at 13 they're asking the court to look at the IJ but they're wrong on that right we certainly look at the reasons that the BIA advanced well if they didn't bring it up then I'm trying to help you here counsel and you seem to be resisting it but if you want to go ahead and argue it on your terms you're welcome to. I believe they're no I'm saying we should look at the IJ's decision yes your honor well I think what Judge Biby is saying is that we shouldn't look at it because the BIA obviously did not find that as a valid reason so really you only have to contend with maybe that the IJ was biased and that shows sort of a prejudgment of the case but you only have to demonstrate why 5 of the reasons aren't really inconsistent after all. I understand your honor yes yes exactly yes I take your point thank you so yes and in going to those points then with the BIA with their you know I have identified their 5 reasons and in terms of the admissions one the initial encounter with the security officials you know the Mr. Schrein never really alleged that those were his persecutors but there are only 3 inconsistencies that the IJ found right and then there was a couple of omissions that he found significant. Oh yes yes then yes those are well the inconsistencies would be for instance the traffic blockade the Mr. Schrein looked at in his statement described a traffic blockade now in his testimony he said no we were parked on the side of the road and there's a lot of onlookers joining that were slowing down traffic so in a way if you read it the statement maybe it does sound as if we were blocking traffic with the cars but you can also read it as if well traffic was impeded and the people were impeding the traffic so perhaps it's not really an inconsistency it's just he's describing the nature of that particular traffic blockade. In terms of the handcuffing the IJ did and the BIA found that that was a inconsistency and we do I will defer the brief we're saying in the brief and that it's not necessarily an inconsistency it's a small timing issue of whether he was outside the car or in the car or in the building at the public security bureau when he got handcuffed. The main point is that he was handcuffed and does it matter in the timing of the incident why does that matter? To us it doesn't to the BIA and the IJ they found that as a material inconsistency. In regards to an omission the BIA found that a material omission was that Mr. Strand did not put an asylum statement that he had an initial encounter with security officials when he initially brought this protest to the city hall to see the mayor and I would say that that's not a material omission in the sense that he never alleged that the security officials were his persecutors. He went up to the door asked can I go speak with the mayor for all we know maybe they're not duly authorized by the government they're just building security officials that part is not clear on the record they say no the mayor is not here he goes back they wait around and then and it's interpreted very clearly public security bureau officials police show up and arrest him. I would not say I would say that that that is not a omission it's not the fundamental factor to the case of who his persecutors were also another omission was that the BIA said that Mr. Strand a material omission was the fact that he didn't mention that he was going to go see the mayor. And as we stay in our brief our position is that he's amplifying his statement describing what the purpose of the protest is we want to go see the mayor essentially I mean every protest seems to have kind of a focal point to get attention maybe it be the papers and in this case he's testifying that he wants to go see the mayor. Did you represent him at this hearing? No your honor I inherited the opening brief on so I'm coming in pretty late in this matter. It seems like there may have been some translation problems he testified in Cantonese. Let me double check what I don't I don't I'm not aware of I can look at the the asylum application I'll indicate that he's Han so that would be Mandarin most likely well. It's a Cantonese interpreter and I'm wondering is he Mandarin or well your honor I think the Cantonese interpreter would be correct because he's from Guangdong and that's Canton so very likely that he can use interpreter was the proper interpreter. Well I appreciate the court's opportunity. Thank you very much I have two seconds. Thank you. May it please the court Jonathan Robbins here on behalf of the respondent Eric Holder good morning. The key question in this case does involve whether the record compels reversal of the agency's adverse credibility finding. And in doing so it's important to recognize that there is no presumption when the alien comes to the government asking for asylum that he is credible is his burden of proof to establish a credible claim. And while I would agree that some of the inconsistencies which my colleague discussed were a little bit nitpicky. There are other problems in his case that aren't nitpicking. Specifically one of the major omissions was the neglecting to mention that he received an injury for which he was hospitalized. Remember that he's been before an asylum officer before immigration judge. He's had numerous opportunities to to really sort of perfect his claim and make sure everything's in there. The asylum application says describe in detail any specifics events or actions that happened to you. And omitted from his asylum application is this mention of the sole injury which he received. That's not just nitpicking. Who helped him prepare his asylum claim? Well I didn't see the signature on the asylum application so I'm not sure but it looks like he was represented by an attorney at the time. We have so many inadequate representations that it's rather difficult to say that an asylum application is incomplete or if it can later be fleshed out by questioning. This is a case which seems to show there was a demonstration. The workers were very disturbed because their pay had been so substantially decreased. And he was selected apparently by his co-workers to kind of be the spokesperson. And it's pretty clear that he was arrested. So is there some major inconsistency that would make us think that this fellow was lacking in credibility? Well yes. Just a quick point with the counsel. If they wanted to allege ineffective assistance of counsel, they could file a motion to reopen and pursue that. They have that avenue of relief available to them if they felt that he wasn't properly represented with respect to the asylum application. With respect to your question and the inconsistencies, I agree with you that this asylum, I think there's certainly some truth mixed in here. But the problem is when an asylum claim is enhanced later in the stages of the asylum application to sort of evince a persecution that's higher than might have actually gone on. I certainly think that a fair reading of this record says this guy's not, this isn't just some completely false claim. There's definitely, I mean, it certainly looks like he was part of a protest. How enhanced was it by giving more detail? Really, just give more detail. Okay. So we start out. His statement's written in, I'm going to say Cantonese. Then there's a translation. And in the translation it says, when I argued with them, the policeman came over and slapped me twice in the face and grabbed my hair and pulled some from my head. Then they locked me up at a detention room. You could read that as saying he was hit in the head when he was at the station and being detained. And that's what he's testifying to. It gives more detail that his being hit in the head was really banging his head on the wall. But it's the same injury. I mean, I don't see these as one injury, but, you know, when the police had him at the station. How different of an injury is this? Well, it's different. The asylum application doesn't say give us a rough outline of what happened and then flesh in the details. It says describe with specificity. Why do you have a hearing? Why is there a hearing anyway? I mean, if you're going to say you have to put the entire story and every detail in the asylum application, why have the hearing? I mean, just put every, you know, then I think you'd have more fraud. You have the hearing to develop the testimony, right? Well, the hearing serves the purpose of seeing if the claims that are made in the asylum application hold up under scrutiny. And certainly some detail can be added. But it's different. I think under our law, you can elaborate on this. And when you look at the asylum application itself, I mean, yes, you can do attachments. And I've seen more and more with lengthier and lengthier attachments, and that's probably because of the way the BIA seizes on these, you know, so-called emissions to determine adverse credibility. But there's not even a lot of space. The intention of the application, if you look at number 2, the space that the form even has contemplates that you're going to do a brief statement in the asylum application. And what's happened is over time, the applicants have had to do these lengthy attachments because if they don't and then they get in and they fill in the story at the testimony, they're all of a sudden deemed not credible. Well, I mean, I can't really – I don't really know what to say about the specific area of space in the asylum application. But I do know that the question that it asks is to specify in detail all events, all actions, to describe it in detail. It doesn't say to just – I mean, when you're asking the government for asylum, they want to know, why are you asking for asylum? And where he fails to mention that he received an injury for which he went to the hospital, no mention of a hospital, not even in the first merits here. It doesn't mention the hospital. You're right. But it does mention the injury. And it says – No, he doesn't. And you're misreading the question, too. It says, Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted, and sentenced or imprisoned in any country other than the United States? Yes. I think you're looking at the wrong question, Your Honor. Well, it says – that's the one where it says, please see attached statement of the applicant. I found the question. Part B-2. When answering the following questions about your asylum or other protection claim – Wait. Tell me what you're reading from. Page 218 of the administrative record. You should provide a detailed and specific account of the basis of your claim to asylum or other protection to the best of your ability to provide specific dates, places, and descriptions about each event or action described. And then it goes on to talk about making attachments and other things of the like. And again, to say that the issue of going to the hospital and receiving medical attention for this injury didn't even come up in the first merits hearing. It came up in the second merits hearing. And if you're applying for asylum and you don't mention the one sole physical injury you have and the seriousness of it – He mentioned the injury. He just didn't mention the hospital. He didn't mention the same injury. At first, it changed from slapping and pulling of hair to having his head banged against the wall such that he had to go to the hospital. I'm sorry. Where did he use the word bang? Because that's the word that the BIA used. Where did he use the word bang? I don't know if he used the word bang. I think he said hit against the wall.  I don't think he did. At least in the testimony that I'm looking at, I looked very carefully. He said push. And he repeated push a couple of times. It was asked repeatedly, so finally he changes the word, or maybe the translator changes the word. And they used the word hit. But he never used the word bang. But that's the word that the BIA used, which is a pretty strong word. And then he describes his – he said he went to the hospital to see if he had a concussion, and he concluded that he didn't have a concussion. All he had was a very light concussion. And when he was asked about it repeatedly, he finally said, you know something? It wasn't the hitting my head that hurt. It was the pulling my hair. And that is in his statement. The pulling of the hair is in the statement. But going to the hospital and receiving medical attention is not. And it certainly looks – you can make a plausible explanation on his behalf as to how maybe it could be explained. But this is a – it's – it certainly – you could see why it could look like the plan was – If it's an enhancement, it certainly is a modest enhancement. And if he was enhancing it, he certainly could have done a better job than he did. And remember that this isn't the only omission from the asylum act. What's the other important omission? There are also two police interrogations while he was detained that are not mentioned at all. As my colleague noted, there's the incident with the security chief that wasn't mentioned. There were the – the whole claim is premised on a trap being sprung. The Chinese police tricked him into thinking that he was going to see the mayor, and then they handcuffed him. And there's inconsistencies as to when exactly it was the trap was sprung. I mean, under the Real ID Act, it's not just looking at an inconsistency or an omission and seeing if you can find a plausible explanation. Under the totality of the circumstances with all these problems, you know, does it look to the immigration judge as though he's set forth a credible claim? And when the claim is consistently becoming more and more enhanced, the later it gets, it certainly looks – Do we have – on the – with respect to the I.J.'s finding that he was not credible, is there any demeanor testimony? Anything that the I.J. said with respect to his demeanor? No. Okay. So it really does sort of rise or fall on what we can read for ourselves in the transcript. These are inconsistencies that were spoken for the transcript and not voice inflections and hesitations and so forth. Yes. However, I would remind the Court again, there is no presumption of credibility. When looking at these inconsistencies and omissions, it's not to say that, oh, well, we can explain these different things away. It's – it's did he credibly establish a claim in consideration of the fact that the claim consistently gets worse and worse the later in the rounds it go. Remember, he had been before an asylum officer who didn't – who referred the case to an immigration judge, so he's had his case looked at a number of times by different adjudicators. And, you know, the claim has changed with respect to these different events that aren't described in the application. At the beginning of the merits hearing, the immigration judge said, have you looked at your written declaration? He gave him an opportunity to amend it, to make sure that everything was included. So he's had his opportunities to perfect his claim and to include everything. And where the asylum application asks you to describe things in detail and you don't mention the severity of the sole injury that you've gotten, you don't mention the specifics with respect to the police interrogating you, you don't mention this incident with the security – with the security people outside of the building where the details of your case are not consistent with respect to serious parts of your story. It can't be said that the record compels one conclusion over the other. Certainly, you can – you can go into every inconsistency and come up with a plausible explanation. But I might add that he said that these were omissions at the time. They asked him, why wasn't this in your – in your application? And he said it was omitted. So, you know, so again, the standard of review is does the record compel a contrary conclusion? It's – if you can go both ways on this issue, the Court should uphold the decision of the Board. Counsel, you're over your time. Oh, I'm sorry, Your Honor. Thank you very much for your time. Thank you very much. All right, Schwinn v. Holder will be submitted, and we'll take up the United States v. Haiti.
judges: Fletcher, Wardlaw, Bybee